**McCUTCHEON, Appellant,**

v.

**STATE MEDICAL BOARD OF OHIO, Appellee.**

[Cite as *McCutcheon v. Ohio State Medical Bd.* (1989), 65 Ohio App.3d 49.]

Court of Appeals of Ohio,
Franklin County.

No. 88AP–743.

Decided Oct. 12, 1989.

*Bricker & Eckler, Richard S. Lovering* and *Diane M. Signoracci,* for appellant.

*Anthony J. Celebrezze, Jr.,* Attorney General, and *Christopher J. Costantini,* for appellee.

STRAUSBAUGH, Judge.

This is an appeal by appellant from a judgment of the court of common pleas which affirmed an order of the State Medical Board of Ohio. The State Medical Board had ordered that appellant's license to practice medicine be suspended for two years.

Appellant, James F. McCutcheon, M.D., is a licensed physician in the state of Ohio and practices psychiatry in Canton. As a result of a complaint filed against appellant by a Canton pharmacist, an investigation was launched by appellee, the State Medical Board ("board"), in November 1983. Upon reviewing the prescriptions written by appellant, the investigator determined that one of appellant's patients had a history of an illegal drug transaction and had obtained prescriptions from appellant for the Schedule II drug Methaqualone ("Quaaludes"). As a result of this information, the board initiated an undercover operation in conjunction with the Stark County Metropolitan Narcotics Unit. The undercover agent visited with appellant on three separate occasions in 1983 and 1984, which visits were surreptitiously tape-recorded. The purpose of these visits was to secure a prescription from appellant for Quaaludes. Although appellant refused to provide the undercover agent with a prescription for Quaaludes on his initial visit, the agent was nevertheless able to secure prescriptions for the drug on his last two visits. The prescriptions were for twenty pills to be taken over a thirty-day period and were issued with appellant's warnings regarding the addictive qualities of Quaaludes.

Following the last visit by the undercover agent in February 1984, a citation letter was mailed by the board to appellant on February 13, 1987, alleging acts of prescribing medications to seven patients in violation of R.C. 4731.22(B)(2), (B)(3) and (B)(6). Following a hearing before the board, a hearing officer of the board rendered a report on February 16, 1988, which found appellant in violation of all three statutory provisions and proposed that appellant's license to practice medicine be revoked. The board modified the proposed order by suspending appellant's license for a minimum of two years and permanently

denied appellant the right to prescribe, administer or dispense controlled substances except for those found in Schedules IV and V.

Appellant appealed this order to the Franklin County Court of Common Pleas which, after staying the order of the board, affirmed the board's order in its entirety on August 22, 1988. The trial court also dissolved its stay order over the board's decision.

On appeal, appellant sets forth the following five assignments of error for our review:

"1. The trial court erred when it adopted a rule of entrapment different from and inconsistent with the rule adopted by the Ohio Supreme Court in *State v. Doran,* 5 Ohio St.3d 187 [5 OBR 404, 449 N.E.2d 1295] (1983).

"2. The trial court erred in finding that there was an admissible evidentiary basis to support the R.C. 4731.22(B)(2), (B)(3), or (B)(6) claims in this case.

"3. The trial court erred in its determination that the Medical Board's erroneous assumption that Quaaludes were 'street drugs' when prescribed by Dr. McCutcheon did not warrant reversal of the Medical Board's decision.

"4. The trial court erred in its determination that the Medical Board's order is not barred by the doctrine of laches.

"5. The trial court erred in its determination that the Medical Board hearing officer's erroneous evidentiary rulings were in accordance with law and did not deny Dr. McCutcheon a fair hearing."

Under his first assignment of error, appellant contends that the trial court erroneously adopted a rule of entrapment which is inconsistent with the definition of "entrapment" in this state. Specifically, appellant maintains that the trial court erred in defining "entrapment" for purposes of administrative disciplinary procedures as the predisposition to do an unethical as opposed to an illegal act. Appellant argues that the sole inquiry for purposes of the entrapment defense is the predisposition of the actor to engage in illegal conduct.

In *State v. Doran* (1983), 5 Ohio St.3d 187, 5 OBR 404, 449 N.E.2d 1295, the Supreme Court of Ohio adopted the subjective definition of "entrapment" in which the focus rests upon the predisposition of the accused to commit an offense rather than upon the actions of the police in inducing the accused to commit the crime. *Doran* holds that the defense of entrapment is established:

" * * * where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute * * *." *Doran, supra,* at paragraph one of the syllabus.

The *Doran* decision makes clear, however, that "entrapment is not established when government officials 'merely afford opportunities or facilities for the commission of the offense' and it is shown that the accused was predisposed to commit the offense." *Id.*, 5 Ohio St.3d at 192, 5 OBR at 409, 449 N.E.2d at 1299, quoting *Sherman v. United States* (1958), 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848, 851. See, also, *State v. Italiano* (1985), 18 Ohio St.3d 38, 42, 18 OBR 75, 78, 479 N.E.2d 857, 861.

In the present case, neither the hearing officer nor the board found that appellant was entrapped by the actions of Sergeant Ream. The trial court did make comments concerning a different definition as to the applicable standard for predisposition. While we find these comments to be erroneous, we do not believe that appellant was prejudiced by the court's statements. Based upon the record before us, we find that the evidence amply supports a determination that appellant was not entrapped. We believe that the facts show a predisposition on the part of appellant to commit the offense.

In *Doran, supra,* the Supreme Court of Ohio listed certain relevant factors to be considered in determining whether an accused had a predisposition to engage in illegal conduct. These factors are:

" * * * (1) the accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity. * * * " *Id.*, 5 Ohio St.3d at 192, 5 OBR at 408–409, 449 N.E.2d at 1299.

In the present case, appellant's predisposition to prescribe drugs "for other than legal and legitimate therapeutic purposes" is sufficiently supported by the record. Apart from appellant's dealings with Sergeant Ream, the board, prior to suspending appellant's license, reviewed six other patient files showing instances in which appellant freely prescribed potentially abusive Schedule II drugs to patients under extremely questionable circumstances.

In one instance, appellant prescribed the drug Parest to a patient who subsequently overdosed and required emergency medical treatment. Despite clear warning that the patient may have been abusing or addicted to the drug, appellant continued to prescribe the drug to this patient after this incident.

In another case, appellant prescribed amphetamines to a patient, apparently as part of a weight loss treatment. When asked about how he monitored the patient's progress, appellant explained that he relied on the assurances of the patient that she was losing weight because, appellant stated, "I don't have a scale in the office."

The record further reveals that appellant kept incomplete records concerning these individuals and would prescribe drugs without performing adequate medical background histories of the patients. These findings are supported by the testimony of medical experts.

Further, appellant's conversations with Sergeant Ream were tape-recorded in appellant's office by means of a body transmitter. During his initial visit, on November 29, 1983, Sergeant Ream requested from appellant a prescription for Quaaludes to "just kick back and relax," for "partying," for "getting high" and to get a "buzz." At the end of this visit, appellant prescribed the drug Halcion for Sergeant Ream.

A little more than a month later, on January 6, 1984, Sergeant Ream returned to appellant's office and stated to appellant that "[t]hat stuff you gave me last time, that didn't amount to nothin'." Sergeant Ream then stated to appellant, "[h]ere I'm payin' 60 bucks an hour and I was told I'd be able to get what I needed here. * * * I may have made a mistake last time in the way I went about it. * * * I'll give you what you need to hear." Later in the conversation, Sergeant Ream indicated to appellant that he had been experiencing trouble sleeping at night and appellant proceeded to write the agent a prescription for Quaaludes at the end of this second visit. Appellant wrote the prescription in spite of the fact Sergeant Ream had informed appellant that in the past he enjoyed taking Quaaludes with alcohol.

Sergeant Ream made his final visit to appellant's office on February 3, 1984. During this visit he indicated to appellant that he and his wife on weekends would combine the Quaaludes with wine to relax and enhance their sexual relations. At one point in the conversation, Sergeant Ream told appellant:

"We had Quaaludes again and it seemed to help. But a couple nights, you know, we were busy runnin' around like on Saturday gettin' stuff done and that and a couple evenings we sat back and kicked back with a bottle of wine and, you know, take a pill and drink some wine and it was good. * * * "

Despite the knowledge that his patient was mixing Quaaludes with wine and might be sharing a potentially addictive drug with another person, appellant proceeded to provide the agent with another Quaalude prescription during that visit.

The record before us indicates a previous involvement by appellant in the activities charged and a willingness to accept the inducements of Sergeant Ream to continue in this behavior. We find that the evidence shows that appellant was predisposed to commit the offense and that the state merely provided appellant the opportunity to prescribe drugs for other than therapeutic and legal purposes.

Accordingly, appellant's first assignment of error is hereby overruled.

As his second assignment of error, appellant maintains that there was no competent evidence before the board to support its order. Specifically, appellant maintains that the medical records of six patients which were used to support the board's findings that appellant violated R.C. 4731.22(B)(2) and (B)(6) were obtained in contravention of the physician-patient relationship. With respect to the violation of R.C. 4731.22(B)(3), appellant argues that there was no evidence that appellant sold prescriptions since each patient displayed symptoms to support each prescription. Appellant argues that all of the evidence indicates that the drugs were prescribed for either a legal or therapeutic reason.

In the present case, appellant was charged with violations of R.C. 4731.-22(B)(2), (B)(3) and (B)(6). Pertinent portions of R.C. 4731.22 provide:

"(B) The board, * * * by a vote of not less than six members, shall, to the extent permitted by law, limit, revoke, or suspend a certificate, refuse to register or refuse to reinstate an applicant, or reprimand or place on probation the holder of a certificate for one or more of the following reasons:

"* * *

"(2) Failure to use reasonable care discrimination in the administration of drugs, or failure to employ acceptable scientific methods in the selection of drugs or other modalities for treatment of disease;

"(3) Selling, prescribing, giving away, or administering drugs for other than legal and legitimate therapeutic purposes or a plea of guilty to, or a judicial finding of guilt of, a violation of any federal or state law regulating the possession, distribution, or use of any drug;

"* * *

"(6) A departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established[.]"

Based upon evidence presented, the hearing examiner issued a finding that appellant was guilty of all three of the above provisions. This finding was upheld by the board and the trial court.

Appellant's main contention is that a proper waiver of the physician-patient relationship was not obtained from the board as to the six patients whose records were used as an evidentiary basis for the R.C. 4731.22(B)(2) and (B)(6) allegations. Appellant further urges that, based upon a decision by the Court of Appeals for Crawford County in *Manthey v. Ohio State Medical Bd.* (1987), 36 Ohio App.3d 181, 521 N.E.2d 1121, this court should rule that these patient records are inadmissible.

■ We do not reach a determination as to whether we would apply the reasoning of *Manthey* to this case. In the present case, the record indicates that appellant did not raise the issue of waiver before the board. Having failed to utilize an available statutory remedy below, we decline to consider its application for the first time on appeal before this court. We find that the evidence amply supports the board's determination that appellant violated R.C. 4731.22(B)(2), (B)(3) and (B)(6). Credible evidence was presented to indicate that appellant prescribed drugs in an inappropriate manner.

Accordingly, we overrule appellant's second assignment of error.

■ Appellant next contends, under his third assignment of error, that the trial court was required to reverse the order of the board since appellant alleges the board's decision was premised upon the erroneous assumption that Quaaludes were "street drugs" under Schedule I rather than Schedule II narcotics. Appellant points to excerpts of the minutes from the board hearings on March 9 to 10, 1988, during which Dr. Rothman inquired as to whether Quaaludes were street drugs during all this time. Dr. Lancione stated that they were.

Appellant's argument is based upon the assumption that the term "street drugs" is synonymous with Schedule I narcotics and that the members of the board all interpreted the term in that manner. We are unpersuaded by appellant's argument as we do not feel constrained to give the term such a narrow construction. We feel that the term "street drugs" would apply to substances which are subject to abuse and are distributed through illegal means. The term "street drugs" may or may not include Schedule I narcotics. Appellant's own witness, Dr. Omar Elazar, acknowledged that in the mid–1980s, Quaalude was a highly sought-after controlled substance used on the street.

The third assignment of error is not well taken and is overruled.

■ Appellant argues, under his fourth assignment of error, that the board's order was barred by the doctrine of laches. As support for this contention, appellant maintains that the three-year delay in bringing these charges against him was a violation of his right to due process as appellant asserts that the board had before it all of the evidence necessary to prosecute him when it concluded its investigation in February 1984.

Notwithstanding the time period involved between the conclusion of the investigation and the mailing of the citation letter to appellant, we do not find the doctrine of laches to be applicable to this case. As a general rule, laches cannot be imputed to the state. *Lee v. Sturges* (1889), 46 Ohio St. 153, 19 N.E. 560. See, also, *Ackerman v. Tri–City Geriatric & Health Care, Inc.* (1978), 9

O.O.3d 62, 64, 378 N.E.2d 145, 147 (principle of laches does not apply to the state of Ohio). Moreover, we do not find any indication from the record that appellant was unduly prejudiced by any delay involved here.

Accordingly, appellant's fourth assignment of error is overruled.

In his fifth assignment of error, appellant maintains that the board's hearing officer made several erroneous evidentiary rulings which prejudiced appellant's opportunity to obtain a fair hearing. Appellant contends that the actions of the hearing officer were conducted in an arbitrary manner.

"As a general rule, * * * administrative agencies are not bound by the strict rules of evidence applied in court. * * * " 2 Ohio Jurisprudence 3d (1977) 261, Administrative Law, Section 93. See, also, *Haley v. Ohio State Dental Bd.* (1982), 7 Ohio App.3d 1, 7 OBR 1, 453 N.E.2d 1262 (the existence of some reliable, probative, and substantial evidence in support of a finding of an administrative agency is sufficient to support such findings).

We are unpersuaded that appellant was prejudiced by the rulings of the hearing officer. While appellant's brief lists four alleged erroneous evidentiary rulings, appellant fails to indicate which rules of evidence were violated nor does appellant indicate how he was specifically prejudiced by these rulings. We believe the record sufficiently supports the findings of the board.

The fifth assignment of error is overruled.

For the foregoing reasons, appellant's five assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

McCormac, P.J., and Whiteside, J., concur.